UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CHRISTOPHER D RAGER,

     Plaintiff,

     v.                                     Case No. 3:20-CV-43 JD

KYLE DUKES, KOSCIUSKO COUNTY
SHERIFF'S DEPT,

     Defendants.

## OPINION AND ORDER

This action arises out of Plaintiff Christopher Rager's employment with the Kosciusko

County Sheriff's Department between January 1, 2019 and his resignation in August 2019. Mr.

Rager has sued Defendant Sheriff Kyle Dukes, both individually and in his official capacity as

Sheriff of Kosciusko County, and the Kosciusko Country Sheriff's Department ("Sheriff's

Department") under 42 U.S.C. § 1983. Now before the Court is the Defendants' Motion for

Summary Judgment [DE 26] on all of Mr. Rager's claims. Mr. Rager responded in opposition

[DE 28], to which the Defendants replied [DE 30]. For the following reasons, the Court

GRANTS Defendants' motion.

## I.  FACTUAL BACKGROUND

Mr. Rager was employed at the Sheriff's Department starting on January 30, 2000 until

he resigned at the beginning of August 2019. [DE 17 at 2]. Mr. Rager started as a deputy sheriff

and worked as a road deputy in the patrol division for 12 to 15 years. [DE 29-1 at 12–13]. Then,

Mr. Rager transferred to the detective bureau where he worked for approximately 5 years on the

drug task force unit. *Id.* at 13–14. When Mr. Rager transferred to the detective burau, he received

no pay increase or additional perks, nor did he receive any promotions or changes in rank during his time as a detective. *Id.* at 14.

Sometime in 2017, Mr. Rager decided to run in the upcoming county sheriff election. *Id.* at 22. Mr. Rager eventually learned that then-State Trooper Kyle Dukes, then-current Sheriff Goshert, and Tony Cirrillo were also running. *Id.* at 22–23. All of the candidates were running as Republicans in the primary election. *Id.* at 24.  Prior to the 2018 primary election, the Sheriff's Department had a negative reputation due to the actions of a prior Sheriff who had been criminally charged and convicted. *Id.* at 27–28. As a result, the Sheriff candidates' intentions centered on reviving the name of the Department. *Id.* at 28. In May 2018, Kyle Dukes won the Republican primary and then won the 2018 general election unopposed. *Id.* at 26.

Prior to the election, Mr. Rager and Kyle Dukes knew each other and had worked cases together. *Id.* at 23. During the campaign, their relationship was good, and the two had no ill feelings or issues. *Id.* at 25. Before Sheriff-elect Dukes took office, he and Mr. Rager met at a coffee shop to discuss the job and to exchange ideas. *Id.* at 26. Mr. Rager told Sheriff-elect Dukes that "he's the winner" and that he would "do [his] best to work for him." *Id.* at 27. The conversation was amicable, and Mr. Rager had no concern about working for Sheriff-elect Dukes. *Id.* Both men wanted to make the best department they possibly could. *Id.*  Nothing suggests that the election occurred with any animus or resulted in harsh feelings.

Sheriff Dukes took office on January 1, 2019. Some of Sheriff Dukes' plans included creating new processes for the Department, creating a multi-agency drug task force, increasing the manpower in the patrol division, and opening up positions to all merit deputies by implementing a new interview and selection process. [DE 29-2 at 5]. Upon taking office, Sheriff Dukes called a meeting with all merit deputies, and advised them of his plan to move personnel

back to the patrol division from their current assignments. [DE 29-1 at 29; 29-2 at 18]. At the meeting Sheriff Dukes informed 3 or 4 individuals, including Mr. Rager, that they would be transferred to the patrol division. [DE 29-2 at 18]. Because others in the drug task force had retired, Mr. Rager was the only detective with the drug task force when Sheriff Dukes took office. [DE 29-1 at 28–30, 34]. Sheriff Dukes' administration created an interview committee and application process for certain positions within the Department and invited all merit deputies to apply for the positions. *Id.* at 29–30; [DE 29-2 at 5]. Sheriff Dukes announced that all positions would be open to everyone and that even the current occupants of them would have to re-apply for their assignments. [DE 29-2 at 5]. Sheriff Dukes also told Mr. Rager during the meeting that he was going to be placed back on patrol. [DE 29-1 at 29]. Mr. Rager applied for the public information officer position, a detective position, and captain position, but was not selected for these positions. *Id.* at 38.

Between February and May 2019, several incidents regarding Mr. Rager's job performance occurred. Throughout that period, Chief Deputy Shane Bucher prepared memorandums documenting the incidents for Mr. Rager's personnel file. In February, Chief Bucher was notified that Mr. Rager did not report for duty. As a result, Chief Bucher documented the violation of Merit Board Rule 4-2.4 in a memorandum and no disciplinary action was taken. [DE 29-4 at 1]. Mr. Rager asserts that he had requested the day off and his immediate superior First Sergeant Don Wiesehan approved it. [DE 29-1 at 109–10]. In March, Chief Bucher received complaints from a victim in a burglary case being investigated by Mr. Rager relating to the case report and criminal charges. [DE 29-3 at 17–18]. Mr. Rager told Chief Bucher he finished the report and advised that the report would be sent to the prosecutor's office, however he failed to send the report. [DE 29-4 at 41–42]. Chief Bucher asked Mr. Rager

3

numerous times to complete the report. Nearly a month later, the report had still not been sent to the prosecutor's office and Capital Marsh requested Mr. Rager complete the report that day and file the case with the prosecutor. [DE 29-3 at 18]. The next day, Mr. Rager still had not done so. *Id.*

In April, the administration became aware that Mr. Rager had improperly filled out a Workmen's Compensation form for an on-the-job injury. [DE 29-3 at 16; 29-1 at 115; 29-4 at 3–4]. Mr. Rager wrote inaccurate information on the form, filled out the form himself, and never provided it to a supervisor for review or signature. [DE 29-3 at 16; 29-4 at 3–4]. Under Merit Board Rule 8-12 – Workmen's Compensation, all claims for injuries shall be submitted to the Sheriff within 24 hours. [DE 27-7 at 57]. Mr. Rager admits that he completed the form himself, brought it to human resources without going through his supervisor (or the Sheriff), and that it was not done within 24 hours. [DE 29-1 at 116]. However, Mr. Rager states the form was not submitted within 24 hours of the accident because he was not aware of the injury until a week later. Chief Bucher prepared a memo documenting the events surrounding Mr. Rager's completion of the Workmen's Compensation form. [DE 27-6]. Once Mr. Rager was cleared for light duty, he was asked to complete a case report by the end of his shift for an outstanding arson matter he investigated in October 2018. [DE 29-3 at 19; 29-4 at 43]. He was also asked to complete the burglary report by the end of that shift. [DE 29-3 at 19]. Mr. Rager does not remember if he finished those reports and notes that if he failed to, it would be insubordination. [DE 29-1 at 149]. Chief Bucher documented these incidents in a memo, noting violations of the Merit Board rules. [DE 29-4 at 43].

In May 2019, Sheriff Dukes initiated an internal investigation regarding Mr. Rager due to these various issues, including the numerous complaints from the burglary victim, failure to

complete case reports, and performance issues. [DE 29-2 at 6]. Captain Marsh was tasked with carrying out the investigation. *Id.* at 7. During the investigation, Sheriff Dukes asserts Mr. Rager was placed on paid administrative leave from May 4-13, 2019, pending the investigation. [DE 27-9 at 1]. Mr. Rager believes this time was a paid suspension. [DE 29-9]. Mr. Rager did not receive anything in writing at this time specifying any charges or stating the reasons for the suspension or leave. [DE 29-9]. On May 8, 2019, Mr. Rager was interviewed by Captain Marsh and Mr. Rager was informed of the allegations against him and was able to provide his side of the story. [DE 29-1 at 160].

The investigation uncovered further issues of Mr. Rager's work performance. First, discrepancies were discovered regarding an April 11, 2019 vehicle pursuit and collision involving Mr. Rager. The dash camera footage and radio traffic were reviewed, and they contradicted what was contained in the incident report. [DE 29-3 at 22; 29-2 at 17]. The report indicates that Mr. Rager "continued straight, the fleeing vehicle turned right into [his] path . . ." [DE 29-4 at 35]. However, Sheriff Dukes and Chief Bucher interpreted the dash camera differently, finding that it captured Mr. Rager ramming into the suspect vehicle. [DE 29-2 at 17; 29-3 at 22]. Mr. Rager then runs up to the suspect's vehicle, punched the suspect in the face, and pulled him from the vehicle. [DE 29-2 at 17]. The Sheriff's Department does not allow a merit deputy to ram into a suspect's vehicle during a pursuit. *Id.* Mr. Rager did not report the use of force immediately and filed an incident report four days late. [DE 29-4 at 19]. Mr. Rager did not believe he needed to complete a use of force report for a pursuit accident or for pulling someone out of a vehicle. [DE 29-1 at 126]. Mr. Rager disagrees that he rammed the vehicle, but believes his actions were justified in order to protect the public. *Id.* at 132. He reported the vehicle damage to First Sergeant Wiesehan via text message and advised he had no injuries. *Id.* at 127.

As a result, Mr. Rager was found to have violated Merit Rules 4-5.2 –Reports; 4-2.18 – Use of Department Vehicles; 4-6.4 – Unsatisfactory Performance. [DE 29-4 at 19–20].

Second, the investigation uncovered that Mr. Rager was involved in a non-approved off-duty security detailed at the Elks Club. [DE 29-3 at 19; 29-4 at 57]. The Elks Club held poker tournaments and wanted someone with a "uniform and badge" to be there to make sure "things didn't get out of hand." [DE 29-1 at 154, 156]. Mr. Rager never went through proper channels to get permission to perform the security detail in accord with the Merit Board Rules. [DE 29-3 at 19]. Officers are not allowed to perform off-duty details where the primary source of income is alcohol, nor where there is gambling. *Id.* The Merit Board Rules require written request to the Chief Deputy at least 24 hours prior to employment for approval. [DE 27-7 at 42]. Mr. Rager testified that he did not get prior verbal or written approval from Chief Bucher or the Sheriff to perform the off-duty detail. [DE 29-1 at 154]. Mr. Rager thought that he only needed to get his supervisor's permission because "that's the way they had been doing it for 20 years." *Id.* at 153. Mr. Rager states he brought up the security detail with First Sergeant Wiesehan, who asked him for further information, but that he never provided him with the requested information. *Id.* at 152; [DE 29-4 at 61].

Third, the investigation revealed an incident where Mr. Rager submitted an overtime request but never listed any reason for why he worked overtime. [DE 29-1 at 161; 29-4 at 65]. When asked, Mr. Rager could not provide any explanation for why he needed overtime. He admits that he did not complete the form, left boxes unchecked, and that he simply could not remember why he even sought the overtime. [DE 29-1 at 160].

Sheriff Dukes consulted with his attorney about the conclusions of the investigation and, despite the numerous violations, ultimately decided not to bring formal charges against Mr.

Rager with the Merit Board. [DE 29-2 at 10]. On May 14, 2019, Sheriff Dukes had an in-person meeting with Mr. Rager, Chief Bucher, and Captain Marsh. *Id.* Mr. Rager was notified of the outcome of the investigation and that he would be suspended for 14 days without pay. Sheriff Dukes told Mr. Rager that he "wanted the old Chris Rager" back and Mr. Rager agreed. *Id.* Sheriff Dukes told him the Department, "needed Chris" and the administration wanted "Chris back on the team." *Id.* At the close of the meeting, Mr. Rager and Sheriff Dukes shook hands and Mr. Rager thanked Sheriff Dukes. *Id.* Mr. Rager was placed on unpaid suspension between May 14, 2019 and May 28, 2019. [DE 29-4 at 83]. On June 5, 2019, Captain Marsh gave Mr. Rager a copy of the investigation report, which detailed the charges against him, and the evidence Sheriff Dukes considered. [DE 29-4]. This included the memos Chief Bucher wrote months before, detailing the various incidents of misconduct. Mr. Rager had not previously seen these documents. Following the suspension, Mr. Rager had no other disciplinary issues. [DE 29-1 at 166]. After learning he was eligible for his retirement benefits, Mr. Rager resigned in August 2019. *Id.* at 168. In January 2020, Mr. Rager filed this action.

## II. STANDARD OF REVIEW

On summary judgment, the burden is on the moving party to demonstrate that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That means that the Court must construe all facts in the light most favorable to the nonmoving party, making every legitimate inference and resolving every doubt in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not a tool to decide legitimately contested issues, and it may not be granted unless no reasonable jury could decide in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence which "demonstrate[s] the absence of [a] genuine issue of material fact." *Id.* at 323. Once the moving party meets this burden, the nonmoving party may not rest on allegations or denials in its own pleading but must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1); *Beard v. Whitley Cty. REMC*, 840 F.2d 405, 410 (7th Cir. 1988). The disputed facts must be *material*, which means that they "might affect the outcome of the suit under the governing law." *Brown v. City of Lafayette*, 2010 WL 1570805, at *2 (N.D. Ind. Apr. 16, 2010). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir. 1996).

### III. DISCUSSION

Mr. Rager asserts five claims in his Amended Complaint: 1) a First Amendment political retaliation claim against Sheriff Dukes for imposing unwarranted discipline on him for opposing him in the 2018 Republican primary election; 2) a Fourteenth Amendment deprivation of due process rights claim against Sheriff Dukes for failing to notify Mr. Rager of the charges against him and for denying him the opportunity to present a defense to the Merit Board before imposing the discipline; 3) a constructive discharge claim against Sheriff Dukes; (4) a claim against Sheriff Dukes for negligently violating Mr. Rager's HIPAA rights; and 5) a state law *respondeat superior* claim against the Sheriff's Department for the acts and omissions of Sheriff Dukes. [DE 17 at 4–5]. The Defendants have moved for summary judgment on all of Mr. Rager's claims. In the alternative, if the Court finds a constitutional deprivation, Sheriff Dukes asserts that he is

entitled to qualified immunity for his decision-making and handling of Mr. Rager's discipline. The Court addresses each claim in turn.

### A.  First Amendment Retaliation Claim

The First Amendment, applicable to state and local governments and their officials through the Fourteenth Amendment, prohibits adverse employment actions against government employees because of their political speech and association. *See, e.g., Rutan v. Republican Party of Ill.*, 497 U.S. 62, 68–76 (1990); *Branti v. Finkel*, 445 U.S. 507, 513–17 (1980); *Elrod v. Burns*, 427 U.S. 347, 349–50 (1976); *Daza v. Indiana*, 941 F.3d 303, 308 (7th Cir. 2019). Mr. Rager's Amended Complaint alleges that Sheriff Dukes retaliated against him because he ran against then-State Trooper Dukes in the May 2018 Republican primary election for sheriff. [DE 17 at 4]. To succeed with his First Amendment retaliation claim, Mr. Rager must show that "(1) he engaged in constitutionally protected speech; (2) he suffered a deprivation likely to deter his free speech; and (3) his protected speech was at least a motivating factor for the deprivation." *Lavite v. Dunstan*, 932 F.3d 1020, 1031 (7th Cir. 2019). A plaintiff must produce evidence that his speech was at least a motivating factor of the employer's decision to take retaliatory action against him. *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). The motivating-factor element is a causation inquiry. *Massey v. Johnson*, 457 F.3d 711, 716–17 (7th Cir. 2006). To withstand summary judgment, a plaintiff must establish the existence of a genuine issue of a material fact regarding the "causal link" between the protected act and the [adverse action]. *Lavite*, 932 F.3d at 1031. If the plaintiff meets his burden, only then does the burden shift to the employer to rebut the causal inference raised by the plaintiff's evidence, by demonstrating that "the harm would have occurred anyway," even without the protected conduct. *Greene v. Doruff*, 660 F.3d 975, 980 (7th Cir. 2011). If the employer fails to counter the plaintiff's evidence, then

the plaintiff has established the causation needed to succeed on his claim. *Kidwell*, 679 F.3d at 965. If the employer carries this burden, the plaintiff may still reach trial by producing sufficient evidence to allow a reasonable fact finder to determine that the employer's reasons were merely a pretext for firing the employee, at least in part, for exercising his First Amendment rights. *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 670 (7th Cir. 2009) (citing *Massey*, 457 F.3d at 716).

The threshold question in a First Amendment retaliation claim is whether the speech was constitutionally protected. *Kubiak v. City of Chi.*, 810 F.3d 476, 481 (7th Cir. 2016). Sheriff Dukes does not dispute that Mr. Rager's running against him in the 2018 primary election constitutes protected activity and therefore, the Court does not analyze this step. Although Sheriff Dukes does not dispute that the 14-day suspension qualifies as an adverse employment action in the context of a § 1983 First Amendment retaliation claim, he incorrectly argues that Mr. Rager's 10-day administrative leave pending the internal investigation does not constitute an adverse employment action. A § 1983 retaliation claim does not require an adverse employment action within the same meaning as other anti-discrimination statutes. *Power v. Summers,* 226 F.3d 815, 820 (7th Cir. 2000). The Seventh Circuit has explained that what was meant by "adverse employment action" in the § 1983 context is that the action of which the employee is complaining must be sufficiently adverse to deter the exercise of the individual's right to free speech. *Power,* 226 F.3d at 820–21. Therefore, Mr. Rager need only show that Sheriff Dukes' discipline was sufficiently adverse to chill his free speech. The Court finds that the internal investigation, the 10-day paid suspension, and the 14-day unpaid suspension all constitute a sufficiently adverse action to deter the exercise of free speech. Regardless of whether the paid 10

days pending the investigation was administrative leave, as the Defendants argue, or a suspension, as Mr. Rager argues, it is a deprivation sufficient to deter First Amendment activity.

Sheriff Dukes primarily argues that Mr. Rager is unable to carry his burden in demonstrating a *prima facie* case that his political activity was a motivating factor in his decision to discipline Mr. Rager, and therefore summary judgment is warranted. One of Mr. Rager's arguments to establish his *prima facie* case for retaliation is the timing of his various adverse employment actions. However, a suspicious-timing argument alone cannot save Mr. Rager's claim. The Seventh Circuit has noted that suspicious timing will "rarely be sufficient in and of itself to create a triable issue." *Kidwell*, 679 F.3d at 966 (internal quotations omitted). For a suspicious-timing argument alone to give rise to an inference of causation, the plaintiff must demonstrate that "an adverse employment action follows close on the heels of protected expression, and the plaintiff [must] show that the person who decided to impose the adverse action knew of the protected conduct." *Lalvani v. Cook Cnty., Ill.*, 269 F.3d 785, 790 (7th Cir. 2001). There can be no set legal rule for determining whether an adverse employment action falls "close on the heels" of protected activity because such a determination "depends on context." *Kidwell*, 679 F.3d at 966.  But it is clear from Seventh Circuit case law that the time period between the protected activity and the adverse action must be "very close."  *Id.* For an employer's actions to be on the heels of an employee's conduct, thus allowing an inference of causation based on timing alone, the Seventh Circuit "typically allow[s] no more than a few days to elapse." *Id.* But this is a context-specific analysis with no formal legal rule. *Id.*

Here, it is undisputed that Sheriff Dukes was aware of Mr. Rager's protected conduct. Mr. Rager argues that "on nearly [the] first day" of Sheriff Dukes' administration he was demoted from his position as detective back to road patrol, constituting suspicious timing.

Sheriff Dukes argues that his reassignment was not an adverse employment action, and his suspension, which was sufficiently adverse, was in May 2019, a year after the May 2018 primary election. Therefore, he argues it was too remote in time to be connected. However, construing the facts and reasonable inferences most favorably to Mr. Rager, prior to January 1, 2019, Sheriff Dukes did not have any authority over Mr. Rager's employment. However, even still, Mr. Rager's suspicious timing argument fails based on the Court's context-specific analysis.

First, Mr. Rager has not established that Sheriff Dukes' decision to reassign Mr. Rager from detective to patrol was a demotion, and therefore an action sufficient to deter his protected speech. In determining whether an action is sufficient to deter protected activity, the Seventh Circuit asks, "whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity." *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 585 (7th Cir. 2021) (noting the "law merely requires some negative consequence (deprivation) with a chilling effect on First Amendment activity"). Mr. Rager testified that when he was originally assigned to detective from patrol, he received no pay increase, and likewise, when he was reassigned to patrol by Sheriff Dukes, he received no decrease in pay or benefits. [DE 29-1 at 14]. He has not presented evidence nor argument that this transfer constituted "diminished responsibility," especially because he maintained the corporal rank. *Id.* at 14–15; *Power*, 226 F.3d at 821 ("Any deprivation under color of law that is likely to deter the exercise of free speech, whether by an employee or anyone else, is actionable, even something as trivial as making fun of an employee for bringing a birthday cake to the office to celebrate another employee's birthday, if (an important qualification) the circumstances are such as to make such a refusal an effective deterrent to the exercise of a fragile liberty.") (internal citations omitted).

However, even if the Court were to find that this reassignment was a sufficient deprivation that is likely to deter the exercise of free speech, Mr. Rager's suspicious timing argument still fails due to the undisputed context surrounding the action. Upon taking office, Sheriff Dukes called a meeting with all merit deputies and advised them of his plan to move personnel back to the patrol division from their current assignments. [DE 29-1 at 29; 29-2 at 18]. Sheriff Dukes had campaigned on helping the patrol division by putting merit officers back on patrol because in comparison to the county population, the numbers of those on patrol was "very low." [DE 29-2 at 5]. He also campaigned on a "multiagency drug task force" and decided to open it up to any merit deputy. *Id.* Mr. Rager testified this meeting was the "first time that [Sheriff Dukes] had addressed" the deputies, and he was sharing his "plan" with all employees. [DE 29-1 at 29]. Sheriff Dukes' plan for his administration was to emphasize patrol. [DE 29-2 at 18]. Mr. Rager testified that Sheriff Dukes opened up detective positions, including the drug task force, for everyone who wanted to apply to those positions. [DE 29-1 at 29]. Chief Bucher testified that Sheriff Dukes opened the positions in investigations and let everyone apply for those positions. [DE 29-3 at 5].

Mr. Rager testified that "in front of everybody" Sheriff Dukes told him he was going to be on patrol. He noted that he was the only person in the drug task force to be moved back to patrol, however, this is due to the fact that there were no other deputies in the drug task force at that time because they had all previously retired. [DE 29-1 at 34; 29-2 at 18]. However, during the meeting, Sheriff Dukes notified "3-4 people" that they would be going back to the patrol division, not just Mr. Rager. [DE 29-2 at 18]. Mr. Rager argues he was the only deputy who was told he would not be considered for any position but road patrol. Yet, Mr. Rager does not cite to anything in the record that supports this assertion nor does the Court find any. Mr. Rager chose

not to apply for his previously held position. [DE 29-1 at 34]. Instead, he applied for the public information officer position, a detective position, and captain position. *Id.* at 38.

Neither party has indicated exactly when this meeting occurred, but it is undisputed that it was early January 2019, at the start of Sheriff Dukes' term. However, allowing an inference of causation based on suspicious timing would be inappropriate when considering the context surrounding the meeting and Mr. Rager's reassignment. Because it is undisputed that the goal of Sheriff Dukes' first meeting with the merit deputies was to discuss his plan as the new Sheriff, which included prioritizing patrol, and Mr. Rager was not the only merit deputy reassigned to patrol during that meeting, the Court finds that a reasonable jury could not find the timing of these events gave rise to an inference that Mr. Rager's protected speech was a motivating factor in his reassignment to patrol.

With regard to the suspensions, these actions were taken more than four months after the start of Sheriff Dukes' term, which is not "close on the heels" of Mr. Rager's protected speech. Mr. Rager argues that the first instance of a disciplinary issue that was part of the internal investigation was his failure to report to duty in February 2019. However, again, a month or so into Sheriff Dukes' term is not close in proximity to Mr. Rager's protected speech. Most importantly, Mr. Rager did not experience any action sufficient to deter his protected speech in February 2019. Rather, it was the first instance of disciplinary issues that was brought to Sheriff Dukes' attention in May 2019, prompting the investigation. *FKFJ*, 11 F.4th at 587 ("A delay of two or three months between any protected activity and adverse action is far from sufficient to raise an inference of retaliation."). Further, where a "significant intervening event separat[es]" an employee's protected activity from the adverse employment action he receives, a suspicious-timing argument will not prevail. *Kidwell*, 679 F.3d at 967. Here, as discussed below, the

14

evidence shows that Mr. Rager's own insubordination led to the discipline that he incurred. Therefore, a reasonable jury could not find that the discipline he received in May 2019 constitutes suspicious timing to give rise to an inference of causation.

Next, the Court must determine if Mr. Rager's protected speech was at least a motivating factor for the discipline imposed by Sheriff Dukes. Causation may be proven through direct or circumstantial evidence. *FKFJ*, 11 F.4th at 586 (citing *Kidwell*, 679 F.3d at 965). Mr. Rager need not show but-for causation, but only that the protected activity is a motivating factor in Sheriff Dukes' conduct. *Id.* (citing *Massey*, 457 F.3d at 717). Mr. Rager testified that Sheriff Dukes never threatened his job. [DE 29-1 at 92, 168]. He also testified that Sheriff Dukes never referred to him as his a "political rival" or that he wanted to "ruin [Mr. Rager's] reputation." *Id.* at 60–61. Mr. Rager also testified that Sheriff Dukes never told him he was going to punish him for opposing him in the primary. *Id.* Since the record lacks any direct evidence of causation, Mr. Rager tries to establish the causation element through circumstantial evidence. To establish causation through circumstantial evidence, a plaintiff may present evidence of "suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at other employees in the protected group." *Kidwell*, 679 F.3d at 966 (quoting *Long v. Tchrs' Ret. Sys. of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009)). However, regardless of the type of evidence offered, the protected activity and adverse action cannot be wholly unrelated. *Id.*

The Court has already discussed the suspicious timing argument and now looks at the other evidence that Mr. Rager argues establishes his *prima facie* case. First, Mr. Rager argues that he received "harsh treatment not shown to employees who weren't a political threat," which gives rise to an inference that his protected speech was a motivating factor in his discipline. [DE 28 at 15]. Sheriff Dukes argues, and the Court agrees, that Mr. Rager's arguments regarding the

absence of harsh treatment of others omit any legal authority and appear to be nothing more than a compilation of speculation, conjecture, and guess work. *Schaefer v. Universal Scaffolding & Equip.*, LLC, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."). Mr. Rager argues that in the ten years *prior* to Sheriff Dukes' term, only three officers had been suspended for misconduct, however, what happened prior to Sheriff Dukes taking office is irrelevant to this action.

After Sheriff Dukes began his term, he suspended, without pay, two other deputies besides Mr. Rager. [DE 29-6 at 2]. Shawn Castillo was suspended for three days without pay, between February 25, 2019 to March 1, 2019, because of his involvement in a domestic violence situation. *Id.* A criminal investigation occurred, and no criminal charges were brought against him, but Chief Bucher testified that they felt his alleged conducted warranted punishment. [DE 29-3 at 21]. Thomas Waikel was suspended for 3 days without pay between November 26-30, 2019 for conduct unbecoming to an officer, immoral conduct, and neglect of duty. [DE 29-6 at 2]. In addition, Mr. Waikel was placed on paid administrative leave for four days, between November 15-20, 2019 and again on December 19, 2019 to March 9, 2020. *Id.*  While investigating a case of possible child sexual molestation, Mr. Waikel started a romantic relationship with the child's mother. [DE 29-2 at 15]. Mr. Rager makes a conclusory argument that he was punished more severely for minor infractions than other officers who committed "egregious misconduct" but did not run for Sheriff. [DE 28 at 16]. Mr. Rager attempts to minimize his infractions as minor, however, in doing so, he ignores that the cause of his discipline includes several rule violations and performance issues that span over the course of four months, several of which he admits, while Mr. Waikel and Mr. Castillo's violations were isolated in nature. Mr. Rager has provided no legal authority supporting his argument nor has he

established that Mr. Waikel or Mr. Castillo's violations are comparable or worse than his. He also ignores the entirety of Mr. Waikel's discipline, particularly that he was placed on administrative leave, or as Mr. Rager would characterize it, paid suspension, for three months. Sheriff Dukes testified that Mr. Rager, Mr. Waikel, and Mr. Castillo's cases were all very serious situations and cannot say one is more severe than the other. [DE 29-2 at 16]. Further, Mr. Rager ignores the evidence that Sheriff Dukes fired Deputy Travis Mickem within his first year of employment for a series of rule violations and performance issues, more similar to that of Mr. Rager's violations, including repeated failure to respond to dispatch calls involving reports or threats of guns, violating sergeant's orders, failure to complete reports in a timely manner, and excessive speed complaints. [DE 29-6 at 3; 29-3 at 12]. The Court finds that a reasonable jury could not find Sheriff Dukes' handling of these situations constitutes harsher treatment of Mr. Rager for comparable violations and therefore cannot give rise to the inference of causation.

Second, Mr. Rager argues that Sheriff Dukes previously never suspended any employee for improperly filling out a Workmen's Compensation claim form, providing erroneous information in a crash report, failing to submit a use-of-force form within 24 hours, or improper submission of an overtime form. Sheriff Dukes testified that he has not disciplined employees for these infractions. [DE 29-2 at 13]. However, Mr. Rager does not present any evidence of other deputies making any or all of these violations and not receiving any discipline. Mr. Rager points to Chief Bucher's testimony that "officers can be late" filing reports and that his standard practice is to give the officer a chance to correct the problem. [DE 29-3 at 20]. However, the evidence establishes that Mr. Rager was given multiple opportunities to complete several late reports and failed to do so, which is consistent with Chief Bucher's standard practice. Also, these were not the only violations that led to Mr. Rager's suspension nor were they considered in

isolation. As Chief Bucher testified, it was a buildup of issues over four months. [DE 29-3 at 21]. Mr. Rager's suspension was also predicated on other infractions, including some he admits.

Third, Mr. Rager argues that Deputy Fowler was also on the Elks Lodge security detail with him but did not receive a suspension. There is evidence that Deputy Fowler wrote to Sheriff Dukes and explained that he was "contacted by Deputy Chris Rager in reference to a security detail at the Elks Lodge" and that "Deputy Rager advised that he spoke with First Sergeant Don Wiesehan about the security detail and it was clear for [them] to continue to provide security at the Elks Lodge." [DE 29-4 at 59]. Mr. Rager testified that Deputy Fowler's letter was accurate. [DE 29-1 at 155]. However, Mr. Rager testified that he never got Chief Bucher's permission, as required by Merit Board Rule 4-7.3(b). He also admits the does not know if First Sergeant Wiesehan ever got the additional information he requested. [DE 29-4 at 57; 29-1 at 152–53]. Mr. Rager asserts he got First Sergeant Wiesehan's approval for the Elks security detail; however, he cites to a piece of the record that does not establish that he got such approval, despite what he represented to Deputy Fowler. [DE 29-1 at 152]. He testified that he interpreted the Merit Rules to allow for this security detail and asserts that never before did he have to get Chief Deputy or Sheriff approval for an employment such as the Elks security detail. While Deputy Fowler was not suspended for his part in the security detail, his violation is not similar to that of Mr. Ragers. First, based on Deputy Fowler's letter to Sheriff Dukes, he relied on Mr. Rager's representation that the security detail had been approved. However, Mr. Rager had not obtained approval through the proper channels. Second, Mr. Rager has not provided the Court with any evidence that Deputy Fowler was similarly situated, given the absence of other violations.

Fourth, Mr. Rager argues that he was disciplined through an "extra-legal" process and this is circumstantial evidence from which a reasonable jury could infer causation. However, the

Seventh Circuit does "not require that an employer rigidly adhere to procedural guidelines in order to avoid an inference of retaliation." *Kidwell*, 679 F.3d at 969. As discussed in more detail in Section III.B, Sheriff Dukes did not violate Mr. Rager's due process rights. To the extent that Mr. Rager argues that not receiving the letter detailing his suspension in writing until a week after it was completed can be inferred as retaliation, without more, the Court does not find this to be a "systematic abandonment" of the Merit Board Rules. *Id.* Particularly because Mr. Rager was notified of all the accusations of misconduct and was given the opportunity to respond at the interview with Captain Marsh during the investigation. Further, given the evidence of Mr. Rager's deficient work performance and rule violations, a technical violation of a policy is insufficient to give rise to an inference of a retaliatory motive. *Id.*

Thus, the Court finds that Mr. Rager has not met his burden to make a *prima facie* case that his protected speech was a motivating factor in Sheriff Dukes' decision to discipline him. Even assuming, *arguendo*, that Mr. Rager could establish a *prima facie* case, Defendants would still be entitled to summary judgment because he cannot show that their stated reasons for discipling him were pretextual. If a *prima face* case were established, "the burden [would then] shift[] to the defendant[s] to show that the harm would have occurred anyway." *Bless v. Cook Cty. Sheriff's Off.*, 9 F.4th 565, 573 (7th Cir. 2021) (internal quotations omitted). And when a defendant makes a showing of nonpolitical grounds for the adverse action, the burden shifts back to the plaintiff to present evidence "demonstrat[ing] a material issue of fact as to pretext" for each of proffered rationales. *Id.*  To meet this burden, he "must show that either (1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or (2) that an employer's explanation is not credible." *Id.* (noting that the plaintiff must demonstrate that the proffered grounds are "unworthy of credence by providing evidence tending

19

to prove that the employer's proffered reasons are factually baseless, were not the actual

motivation for the discharge in question, or were insufficient to motivate the employment

action.") (internal quotations omitted). "Pretext is more than a mistake on the part of the

employer; it is a phony excuse." *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004).

Mr. Rager has also failed to meet this burden.

Here, Sheriff Dukes points to several nonpolitical reasons for Mr. Rager's discipline, as

detailed in the memorandums documented by Captain Marsh and Chief Bucher in the

investigation report. [DE 29-4]. On May 14, 2019, Sheriff Dukes found that based on the internal

investigation completed by Chief Bucher and Captain Marsh, the events that precipitated the

investigation warranted a 14-day unpaid investigation. The reasons for the suspension were:

> Time off failure to report to work; Improperly filed worker's compensation claim;
> providing erroneous information pertaining to a crash report to the investigating
> officer; Failure to notify the supervisor(s) of the use of force and not completing
> the required report withing 24 hours; Failure to complete report(s) and/or
> supplemental reports for active cases; Establishing a security detail without proper
> authority and/or permission; Improper overtime form submission.

[DE 29-4 at 83]. Mr. Rager admits to several of these findings. As discussed above, Mr. Rager

admits that did not seek or get approval from Chief Bucher for his Elks security detail as

required by the Merit Board Rules. [DE 29-1 at 152–53]. He also admits that First Sergeant

Wiesehan had asked for more information on the detail and he never received it. Although Mr.

Rager interpreted the Merit Board Rules differently than Sheriff Dukes and had never needed

Chief Deputy approval in the past, this does not establish that it is more likely that a

discriminatory reason motivated Sheriff Dukes than the proffered non-discriminatory reason or

that his explanation is not credible or lacks a factual baseless. Further, Mr. Rager admits that he

submitted a number of reports late and he admits that he improperly filled out an overtime

request form.[1] Accordingly, these proffered undisputed reasons for his suspension cannot be pretext.

While Mr. Rager does present some evidence contradicting some of the findings from the investigation, and therefore Sheriff Dukes' reasons for suspending him, error alone does not show pretext. *See Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389–90 (7th Cir. 2020) ("[P]retext . . . is not just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action.") (internal quotations omitted). Mr. Rager disagrees with Sheriff Dukes' conclusions regarding the collision with the fleeing suspect's car. Mr. Rager asserts that it was the suspect who drove in front of Mr. Rager causing the collision, which is what he wrote in his report. [DE 29-4 at 35]. During the internal investigation, however, discrepancies regarding this vehicle pursuit and collision were found when the dash camera footage was reviewed. [DE 29-3 at 22; 29-2 at 17; 29-4 at 19–20]. The memorandum prepared in the investigation indicates that the video shows that Mr. Rager used his police vehicle to ram the vehicle of a fleeing suspect resulting in damages to both vehicles, including several thousand dollars of hidden damages of the squad car that was located while fixing the cosmetic damage. [DE 29-4 at 19]. Mr. Rager testified that the suspect "drove in front of [him] and our vehicles struck" and he disagreed with the use of "ram" in the memo. [DE 29-1 at 126, 128]. He later testifies that he "did run into the car, but [the suspect] turned in front of me." *Id.* at 132. Mr. Rager admits that reviewing the incident is "probably interpretation" and "the Dukes administration saw it and they see it in a different way." *Id.* at 132–33.

---

[1] Mr. Rager repeats the same arguments regarding these violations as he made in his attempt to make his *prima facie* case, namely that others were not punished for late reports or working a non-approved security detail. For the same reasons they failed there, they fail to establish pretext.

After the pursuit ended, he apprehended the suspect. *Id.* at 122. Sheriff Dukes testified that on the dash camera video he observed Mr. Rager run up to the suspect's vehicle, open the door, punch the suspect, and pull him out of the vehicle. [DE 29-2 at 17]. Sheriff Dukes testified that this kind of maneuver would require the completion of a use of force report. *Id.* Mr. Rager has not disputed this evidence. Mr. Rager took pictures of the damage to the vehicle and texted those pictures to Sergeant McCune. Another officer from Winona Lake Police Department, who was also involved in the pursuit, completed an accident report. [DE 29-1 at 124]. The memo also notes that Mr. Rager did not make any immediate indication that force had been used, both for using the vehicle and for the physical contact used to make the apprehension. A use of force report was not completed until four days after the incident, which was more than 24 hours after the incident, as required by the Merit Board Rules. [DE 29-4 at 35].

The memo notes Mr. Rager's conduct surrounding the pursuit, collision, and subsequent reporting violated three merit board rules—4-5.2 – Reports, 4-2.18 – Use of Department Vehicles, and 4.6.4 – Unsatisfactory Performance. The memo specifically states:

> The use of force was not properly reported immediately to a supervisor, and the written report was not completed in a timely manner. The information on the crash report is contradictory to the actual events as they occurred. Deputy Chris Rager is aware that ramming another vehicle is a prohibited activity. Deputy Chris Rager did not notify or seek any medical attention immediately after the event. This first indication of a problem was four (4) days after the event.

[DE 29-4 at 19–20]. Mr. Rager does not deny that a use of force form may have been required, but simply justifies that he did not do it because he has never filled out a use of force form before. [DE 29-1 at 128]. Although he texted his supervisor after the collision, he does not dispute that he did not make any indication to his supervisor that force was used, which is the basis of the violation. *Id.* at 130. Mr. Rager testified that he did not provide the officer from Winona Lake PD with any erroneous information about the crash, and believes the officer

documented his own observations. *Id.* The memo detailing the reasons for his suspension does indicate that he provided "erroneous information pertaining to a crash report to the investigating officer." [DE 29-4 at 83]. However, Mr. Rager did complete his own report regarding the incident, *id.* at 35, and his report is still is inconsistent with Sheriff Dukes' interpretation of the collision. This report is dated April 15, 2019, four days after the incident. Mr. Rager does not dispute the date of this report. While Mr. Rager testified that he texted his supervisor regarding the collision, the memo does not conclude otherwise. Rather, it concludes that Mr. Rager did not properly report the use of force to a supervisor and his written report was not completed in a timely manner. Although not related to the collision, Mr. Rager disputes the failure to report for duty violation. *Id.* at 1. Mr. Rager asserts that he had requested the day off and his immediate superior First Sergeant Wiesehan approved it. [DE 29-1 at 109–10].

However, none of Mr. Rager's characterizations of certain events during and after the collision support a reasonable inference that these events were pretext for Mr. Rager's discipline. First, the Court does not find that all of Mr. Rager's version of events are directly in dispute with Sheriff Dukes. But even if these facts are in dispute, particularly that Mr. Rager did not provide erroneous information to the investigating officer, that he did not ram the car into the suspect's car, or that Mr. Rager was approved to take the day off, Mr. Rager has only established that Sheriff Dukes had a mistaken judgment or faulty reasoning as to these events. Sheriff Dukes' mistakes are not pretext—it must be a "a lie, specifically a phony reason" in order to be pretext. However, as Mr. Rager admitted, how the collision occurred was a matter of interpretation and a matter of interpretation cannot be a lie or a phony reason. A mistaken conclusion is not equivalent to "a phony excuse." *Hudson*, 375 F.3d at 561. Further, Mr. Rager has not established that Sheriff Dukes' proffered reasoning is factually baseless. Indeed, the record is devoid of any

23

evidence that Sheriff Dukes' conclusions surrounding these events were the product of bad faith. Nor has Mr. Rager shown that it is more likely that a discriminatory reason motivated Sheriff Dukes rather than the disciplinary events, nor has he established that Sheriff Dukes' explanation is not credible. *Bless*, 9 F.4th at 573. Regardless, even if Mr. Rager could convince a jury to disbelieve these justifications, he has failed to cast doubt on Sheriff Dukes' other grounds for suspending him.

Next, Mr. Rager argues that the other reasons for his discipline are "equally groundless." Mr. Rager was found to have violated two Merit Board Rules based on the conduct surrounding the Workmen's Compensation Form, including Rule 4-5 – Reports and Rule 8-12 – Workmen's Compensation. [DE 29-4 at 3–4]. In the investigation report, the memorandum prepared by Chief Bucher notes that the form states that the Sheriff's Office was notified of the injury of April 11, 2019, which was not accurate, and the claim of the injury was not submitted or notified to the Sheriff within 24 hours. The rules note that "not later than 24 hours after the facts giving rise to the necessity of a report are made known to that employee" and "all claims for injury shall be submitted to the Sheriff within 24 hours." *Id.* at 4. Mr. Rager admits that he did not notify the Sheriff's Department on April 11, 2019, despite noting it on the form. [DE 29-1 at 118–19]. Mr. Rager does not dispute the factual descriptions surrounding his conduct related to the Workmen's Compensation form. [DE 29-1 at 115, 119]. Mr. Rager admits he wrote inaccurate information on the form, filled out the form himself, and never provided it to a supervisor for review or signature. *Id.* at 116; [DE 29-4 at 3–4].

However, Mr. Rager testified that he believes he notified the necessary personnel "as soon as practical" because he did not know he was injured from the collision until April 17, 2019 when the Emergency Department informed him that he had a tear in his spine and that his L5

was pushing on his nerve root in his spine. [DE 29-1 at 117; 29-4 at 5]. Mr. Rager argues that since his conduct would not have violated this policy, the suspension must have been motivated by retaliation. However, this argument falls short. Construing this fact and reasonable inferences in the light most favorably to Mr. Rager, it may establish that Sheriff Dukes' understanding of the Mr. Rager's injury was a mistake, however, he has not established that it was a phony excuse or a lie, factually baseless, or more likely to be motivated by Mr. Rager's previous political run. Mr. Rager agreed with all the facts detailed in the investigation report regarding this particular issue, including that he filled out the report inaccurately and that it was not completed 24 hours after the accident, but simply argues his interpretation of the rules. Sheriff Dukes' faulty reasoning or mistaken judgment on when Mr. Rager should have notified the Department of his injury does not rise to an inference of causation. What's more, "a showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext for the prohibited animus." *Bless*, 9 F.4th at 573 (internal quotations omitted). Mr. Rager simply has not presented evidence that could lead a trier of fact to determine that the Sheriff Dukes' justifications for suspending him, specifically those that Mr. Rager disagrees with, were pretext for political retaliation. Even if Sheriff Dukes' conclusions were unfair, they were not unlawful. *See, e.g., Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006) ("Federal courts have authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely when the adverse action is unwise or even unfair. We do not sit as a super-personnel department with authority to review an employer's business decision as to whether someone should be fired or disciplined because of a work-rule violation.") (internal quotations omitted).

As a seemingly alternative argument, Mr. Rager suggests that even if he had committed the infractions, they would not justify the discipline he received. Under some circumstances,

"grossly excessive" punishment may "cast[ ] doubt on [an employer]'s true motive." *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 290 (7th Cir. 1999). But the Seventh Circuit has only endorsed this argument in unusual circumstances, such as when an employer: (1) "change[s] its story" about why the employee was disciplined, *id.* at 291, (2) adopts an "unpersuasive interpretation of its [own] code", *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 275 (7th Cir. 1996), or (3) has a history of imposing minimal discipline for similar offenses, *see Stalter*, 195 F.3d at 290–9. Nothing in the record suggests this case fits into any of those categories. Sheriff Dukes has not changed his explanation for Mr. Rager's discipline and prepared an extensive investigation report, documenting the investigation's conclusions and reasons for the discipline. Mr. Rager has not presented any evidence that Sheriff Dukes embraced an unpersuasive interpretation of the Merit Board Rules, even though it was occasionally different from his own interpretation or that he was able to act differently with Sheriffs in the past. And as discussed above, Mr. Rager has failed to sufficiently identify a comparable employee who received a milder punishment for similar offenses. In fact, the record indicates that Sheriff Dukes has terminated an employee for somewhat similar infractions, which is a harsher punishment than Mr. Rager received. As such, Sheriff Dukes' decision to discipline Mr. Rager is not so "grossly excessive" as to cast doubt on the reasons for that decision.

Lastly, Mr. Rager submits an affidavit from his son, Stone Rager, arguing it is "other indicia of retaliatory intent." [DE 28 at 20; 29-10]. Stone works as a fireman in North Webster, Indiana. On June 7, 2019, Sheriff Dukes came to Stone's place of work and asked to speak with Stone and the Fire Chief. [DE 29-10 at 1]. Sheriff Dukes told Stone he wanted to "clear the air" between the two of them. *Id.* Sheriff Dukes told Stone that he knew he also worked as a Deputy Coroner and that he had frequently seen him around the Kosciusko County Justice Building. *Id.*

Sheriff Dukes said that he would "hate for anything to happen that made that not possible." *Id.* at 2. Stone interpreted this statement to mean "that [Sheriff Dukes] might get [him] banned from the Justice Building, which would make it impossible for [him] to work as a Deputy Coroner." *Id.* Mr. Rager argues the only reason for this conversation was to intimidate Mr. Rager by "threatening his loved ones." [DE 28 at 20]. Sheriff Dukes moves for this affidavit to be stricken or disregarded, arguing it is both speculative and immaterial. [DE 30 at 13].

Sheriff Dukes has not presented sufficient grounds to strike the affidavit. However, given the passage of time since Mr. Rager's protected speech and the weakness of the circumstantial evidence argued by Mr. Rager as discussed in detail above, it "would be unreasonably speculative" to conclude any inference that this interaction between Stone Rager and Sheriff Dukes was motivated by Mr. Rager's protected speech. *See Lavite*, 932 F.3d at 1032. First, Mr. Rager has not provided any evidence that this interaction had anything to do with him, let alone his employment or his running against Sheriff Dukes in the primary election. Second, the interaction occurred *after* any disciplinary actions were imposed on Mr. Rager and even after Mr. Rager had finished serving his suspension. Third, Stone Rager's own speculations and suspicions of what Sheriff Dukes meant by the statement that he would "hate for anything to happen that made that not possible" does not meet Mr. Rager's burden in defeating a summary judgment motions. *See Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1137 (7th Cir. 1997) ("Speculation does not meet a party's burden in defending a summary judgment motion. Facts, not an employee's perceptions and feelings, are required to support a discrimination claim.") (internal citations omitted).

The Court also notes that where an employer proffers "more than one reason for the challenged action, a plaintiff must address all of the employer's suggested reasons." *Mullin v.*

*Temco Mach., Inc.*, 732 F.3d 772, 778 (7th Cir. 2013) (citing *Hudson*, 375 F.3d at 561). Mr. Rager has not done so here nor can he, as he has admitted to some of the conduct in Sheriff Dukes' proffered reasons for his suspension, and therefore cannot meet his burden that the reasons were pretext. [DE 28 at 19 ("Of the charges against him where Rager admits misconduct, the misconduct was minor. Rager admits that he submitted a number of reports late. He admits that he improperly filled out an overtime request form.")]. Because Mr. Rager has failed to meet his burden of establishing the elements of his *prima facie* retaliation case and establishing that the Defendants' proffered nonpolitical reasons for discipling him were pretextual, summary judgment on his First Amendment claim is warranted.

## B. Due Process Claim

Mr. Rager contends that Sheriff Dukes' decision to place him on a 10-day paid suspension and then a 14-day unpaid suspension instead of preferring charges with the Merit Board violated his due process rights under the Fourteenth Amendment. To prevail on a due process violation claim, plaintiffs must show (1) that they had "a constitutionally protected property interest," (2) that they were deprived of that property interest, and (3) that the deprivation occurred without due process of law. *Kiddy–Brown v. Blagojevich*, 408 F.3d 346, 360 (7th Cir. 2005). Procedural due process claims entail two inquiries: (1) whether the plaintiff was deprived of a protected interest; and (2) if so, what process was due. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 571 (7th Cir. 2017). The Constitution does not create property interests; property interests that entitle the owner to due process protections generally arise from a statute, ordinance, or contract. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

Indiana Code § 36–8–10–11(a) states in part, that "[t]he sheriff may dismiss, demote, or temporarily suspend a county police officer for cause after preferring charges in writing and after

a fair public hearing before the [Merit Board], which is reviewable in the circuit court, superior court, or probate court." Merit Board Rule 1-2 states that "[w]hen the Sheriff seeks to dismiss a county police officer or impose a suspension exceeding 15 days or demote an Officer who was served for one year and is no longer on probation, the Sheriff must file formal charges against the police officer before the Sheriff's Merit Board." [DE 27-7 at 5]. The Indiana Supreme Court has held that § 36–8–10–11(a) creates a legitimate claim of entitlement by Sheriff's Deputies to their jobs, such that constitutional due process protections apply when a Deputy may lose his or her job. *McCorkle v. Henry County*, 2006 WL 1547082, *4 (S.D. Ind. June 1, 2006) (citing *Marion County Sheriff's Merit Board v. Peoples Broadcasting Corp.*, 547 N.E.2d 235, 239 (Ind. 1989)). By contrast, Indiana state courts have not determined specifically whether § 36–8–10–11(b) creates a protected property interest. Under § 36–8–10–11(b), a sheriff is expressly permitted to impose a temporary paid or unpaid suspension not exceeding 15 days without going before the Merit Board. Merit Board Rule 1-2.4 states, in part, "[t]he Sheriff may suspend a police officer for up to 15 days at his sole discretion and without intervention of the Sheriff's Merit Board." [DE 27-7 at 6]. This district has found that "[a]lthough § 36–8–10–11(a) creates a property interest in continued employment, the scope of this property interest is limited by § 36–8–10–11(b)." *Vasquez v. Lake Cty. Sheriff's Dep't*, 2008 WL 5070450, at *8 (N.D. Ind. Nov. 25, 2008).

Sheriff Dukes argues that Mr. Rager's 14-day unpaid suspension is explicitly permitted under Indiana law and he was not required to prefer charges to the Merit Board to impose the 14-day unpaid suspension. He also argues that Mr. Rager does not have a protected property interest in a suspension that does not exceed 15 days. [DE 27 at 20]. Further, Sheriff Dukes argues that Mr. Rager's 10-day paid administrative leave did not implicate due process protections. Mr. Rager asserts that he was told he was suspended with pay for 10 days pending the investigation,

not paid administrative leave. [DE 29-9 at 1–2]. He argues his suspensions, both paid and unpaid, equals a total of 24 days of suspension and under the Merit Board Rules and Indiana law, Sheriff Dukes deprived him of due process by failing to prefer charges to the Merit Board and follow the outlined procedures. The parties dispute whether, during the internal investigation, Mr. Rager was on "paid administrative leave" or "paid suspension."

Even construing the facts and reasonable inferences in the light most favorable to Mr. Rager, a 10-day paid suspension to conduct an internal investigation and a 14-day unpaid suspension as discipline resulting from the conclusions of that investigation, imposed at different times, do not amount to a 24-day suspension, warranting the procedures set forth in the Merit Board Rules and statute for a suspension exceeding 15 days. Mr. Rager has not presented evidence to establish that his suspensions constitute a 24-day suspension, nor has he supported his argument with any legal authority interpreting two separately imposed suspensions, one to conduct an investigation and one to impose discipline, as one continuous suspension. Further, Mr. Rager cannot establish that either separately imposed suspension constitutes a deprivation of a property right subject to federal constitutional protections.

First, the Court addresses Mr. Rager's 10-day paid suspension during the internal investigation. On May 2, 2019, Mr. Rager met with Sheriff Dukes and Chief Bucher. Chief Bucher informed Mr. Rager he was suspended for 10 days with pay pending an investigation of his conduct. *Id.* Chief Bucher did not tell Mr. Rager what misconduct was being investigated, however, he did specify that it was not criminal in nature. [DE 29-1 at 106]. On May 8, 2019, during the investigation, Mr. Rager was interviewed by Captain Marsh and was asked about all the incidents being investigated. Mr. Rager was given the opportunity to discuss and respond to all the issues with Captain Marsh. *Id.* at 160.

Generally, non-pecuniary losses do not rise to the level of procedural due process protection. *See Deen v. Darosa*, 414 F.3d 731, 734 (7th Cir. 2005) ("[A] job action that causes no pecuniary loss whatsoever does not implicate the Constitution."); *Swick v. City of Chicago*, 11 F.3d 85, 87 (7th Cir. 1993) ("We do not think that 'property' within the sense of the amendment should be extended to the purely dignitary or otherwise non-pecuniary dimensions of employment."). Further, "to recover for a deprivation of a property interest, [a plaintiff] must show some economic loss from the [state's] action, or at least an identifiable impact on his future income or economic benefits." *Barrows v. Wiley*, 478 F.3d 776, 780 (7th Cir. 2007) (internal quotations omitted); *see also Palka v. Shelton*, 623 F.3d 447, 452 (7th Cir. 2010) (finding a suspension with pay does not trigger due-process protections unless the suspension imposes a substantial indirect economic effect on the plaintiff). Purely dignitary and non-pecuniary interests, "such as professional satisfaction, personal relationships, and reputation, do not constitute property." *Barrows*, 478 F.3d at 780.

Here, Mr. Rager has not presented any evidence that he suffered a pecuniary loss during his 10-day paid suspension nor has he claimed to have suffered any indirect economic consequences as a result of this suspension. It is disputed, however, whether Mr. Rager kept his police powers, patrol car, and gun while he was suspended with pay during the investigation. Even if Mr. Rager did have his gun, patrol car, and badge taken from him, these do not escalate to a constitutional deprivation. These "deprivations" are of his "law enforcement credentials," to which he has no property interest. *See Wheeler v. Piazza*, 2018 WL 835353, at *7 (N.D. Ill. Feb. 13, 2018) (finding that a plaintiff police officer who was placed on administrative leave who was deprived his "law enforcement credentials," his state-owned supplies, and his "law enforcement authority" had no property interest and therefore no due process concerns were implicated). The

Seventh Circuit has held that a plaintiff has no property interest in the "purely dignitary or otherwise nonpecuniary dimensions of employment," the deprivation of which does not implicate due process concerns. *Swick*, 11 F.3d at 87 (finding no deprivation of a property interest where plaintiff police officer placed on involuntary sick leave was required to turn in his badge and gun, and was forbidden from exercising the powers of a police officer, but had alleged no loss of pecuniary benefits). The losses connected with Mr. Rager's 10-day paid suspension are "purely dignitary or otherwise nonpecuniary dimensions of employment." Accordingly, Mr. Rager has asserted no pecuniary loss connected to the 10-day paid suspension, and therefore no due process concerns are implicated by this suspension.

Next, the Court addresses the 14-day unpaid suspension. Before the Court can reach whether a deprivation occurred without due process of law, it must first determine whether Mr. Rager had a constitutionally protected property interest in his 14-day unpaid suspension. As noted above, Indiana state courts have not determined specifically whether § 36–8–10–11(b) creates a protected property interest. *Vasquez*, 2008 WL 5070450, at *8. However, in reviewing a similar statute to § 36–8–10–11(b), the Indiana Court of Appeals determined that there was no protectable property interest. *State ex rel. Dunlap v. Cross*, 403 N.E.2d 885, 888 (Ind. App. Ct. 1980). In *Dunlap*, the statute provided that a police officer could be suspended up to and including ten days without pay and without judicial review. *Id.* The plaintiff challenged his suspension of less than ten days. *Id.* at 887. The court found that the statute was unambiguous in prohibiting judicial review for suspensions that did not exceed ten days and therefore, the plaintiff did not have a protectable property interest in a suspension that failed to exceed ten days. *Id.* at 888. Like the statute in *Dunlap*, § 36–8–10–11(b) does not provide that a temporary

suspension not exceeding 15 days is reviewable by a court. By contrast, § 36–8–10–11(a) expressly allows for a temporary suspension of more than 15 days to be reviewed by a court.

Additionally, the Seventh Circuit has found that no property right existed where a statute allowed a public employee to be suspended up to 15 days without a hearing. *See Listenbee v. City of Milwaukee*, 976 F.2d 348, 354 (7th Cir. 1992). In *Listenbee*, a Wisconsin statute similar to § 36–8–10–11(a), created a property right in a public employee's employment. *Id.* at 352. However, another section of the same statute, similar to § 36–8–10–11(b), allowed for a suspension of up to 15 days without a hearing. *Id.* at 351. The Seventh Circuit held that although the plaintiff had a property right in continued employment, she did not have a property right in continuous employment. *Id.* at 354. The Seventh Circuit analyzed whether the statute's failure to say that an employee can be suspended "for any reason" and the use of "reasonable period not exceeding 15 days" provide substantive limits on the defendant's ability to suspend civil servants. A state creates protected liberty or property interests by "placing substantive limitations on official discretion." *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983). The court found that the *Listenbee* statute's language does not qualify as "explicitly mandatory language, in connection with the establishment of specified substantive predicates to limit discretion." 976 F.2d at 353 (internal quotations and citations omitted).

Here, § 36–8–10–11(b) does not include the condition "for cause," which is in contrast with § 36–8–10–11(a) that requires cause for suspensions exceeding 15 days. Section 36–8–10–11(b) indicates that no hearing before the board is required but "charges of misconduct" should be preferred to the officer. This language does not contain explicitly mandatory language limiting the Sheriff's discretion to suspend a deputy for 15 days or less, but rather provides a procedure to follow. "[A statute] that 'merely provides procedures to be followed does not

33

include a substantive right' if the procedures protect nothing more than employment that can be [suspended by the Sheriff's sole discretion]." *Manley v. Law*, 889 F.3d 885, 893 (7th Cir. 2018) (quoting *Miyler v. Village of East Galesburg*, 512 F.3d 896, 898 (7th Cir. 2008). The Court finds § 36–8–10–11(b) analogous to the statute in *Listenbee* and it does not place "substantive limitations" on the Sheriff's discretion.

Therefore, consistent with *Dunlap*, *Listenbee*, and *Vasquez*, the Court finds that although Mr. Rager had a property interest in continued employment, under § 36–8–10–11(b) he does not have a property interest in continuous employment. Because Mr. Rager has no property interest in his 14-day unpaid suspension, no due process concerns are implicated, and the Court need not reach the question of whether Mr. Rager was deprived of due process. Accordingly, summary judgment is warranted in favor of the Defendants on Mr. Rager's due process claim

### C. Constructive Discharge Claim

Mr. Rager alleges that due to his unwarranted disciplinary actions, Sheriff Dukes constructively discharged him "by making it impossible for him to function as a police officer." [DE 17 at 4]. A constructive discharge constitutes an adverse employment action. *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004). It occurs when the plaintiff shows that he was forced to resign because his working conditions, from the standpoint of the reasonable employee, had become intolerable. *Id.*; *Roby v. CWI, Inc.*, 579 F.3d 779, 785 (7th Cir. 2009); *E.E.O.C. v. Univ. of Chi. Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002). Our circuit has recognized two different forms of constructive discharge, but neither dispenses with the requirement that the work environment had become intolerable. *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010)

The first form of constructive discharge the Seventh Circuit recognizes occurs "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be

terminated . . . ." *Univ. of Chi. Hosps.*, 276 F.3d at 332. In this situation, if the plaintiff employee

resigns, the employer's conduct may amount to constructive discharge. *Id.* This form of

constructive discharge, however, does not eliminate the need for the plaintiff to show that his

working conditions had become intolerable. *Id.*; *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d

331, 333 (7th Cir. 2004). And a working condition does not become intolerable or unbearable

merely because a "prospect of discharge lurks in the background." *Cigan*, 388 F.3d at 333. The

second form is when an employee resigns due to alleged discriminatory harassment. Such cases

require a plaintiff to show working conditions even more egregious than that required for a

hostile work environment claim because employees are generally expected to remain employed

while seeking redress, *Roby*, 579 F.3d at 785, thereby allowing an employer to address a

situation before it causes the employee to quit. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d

781, 790 (7th Cir. 2007).

The bar for establishing a constructive discharge is high: "Constructive discharge occurs

when an employee's job becomes so unbearable that a reasonable person in that employee's

position would be forced to quit." *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1032 (7th Cir.

2004). A plaintiff must prove that the defendant engaged in harassing behavior sufficiently

severe or pervasive to alter the conditions of his employment and that the abusive working

environment became so intolerable that his resignation qualified as a fitting response. *Witte v.

Wisc. Dep't of Corr.*, 434 F.3d 1031, 1035-36 (7th Cir. 2006) (noting due process constructive

discharge claim uses the same general approach as a Title VII hostile work environment claim

but that alleged working conditions "must be even more egregious than those that would support

a finding of a [Title VII] hostile work environment").

Mr. Rager interchangeably argues constructive discharge under both recognized forms and has not met his burden for either. First, Mr. Rager argues he had "no choice but to resign or possibly face further unwarranted discipline or even be fired." [DE 28 at 22; 29-1 at 92]. "But this is not the kind of choice that makes an otherwise voluntary resignation involuntary." *Palka*, 623 F.3d at 453 (finding the choice between retiring with full benefits or appearing before the Merit Board and risk termination and loss of benefits, did not establish constructive discharge or coerced resignation). Mr. Rager has not presented any evidence demonstrating his imminent or inevitable termination or that "the handwriting [was] on the wall and the axe was about to fall." *Univ. of Chi. Hosps.*, 276 F.3d at 332 (internal quotation omitted).

In fact, the evidence before the Court establishes the exact opposite—Sheriff Dukes and his administration wanted Mr. Rager to continue working as a deputy despite the disciplinary issues. Mr. Rager testified that Sheriff Dukes told him he "wanted [Mr. Rager] to be on their team . . . they thought [he] had a lot to offer to the younger deputies, but there's no room on the team for people that don't want to be on the team" and Mr. Rager told them he wanted to be on the team. [DE 29-1 at 92–93]. Sheriff Dukes testified, and Mr. Rager does not dispute, that during the meeting discussing his 14-day suspension, he told Mr. Rager he "wanted the old Chris Rager" back. [DE 29-2 at 10]. Mr. Rager testified that Sheriff Dukes never threatened his job. [DE 29-1 at 92, 168]. He also testified that Sheriff Dukes never referred to him as his a "political rival" or that he wanted to "ruin [Mr. Rager's] reputation." *Id.* at 60–61. Mr. Rager also testified that Sheriff Dukes never told him he was going to punish him for opposing him in the primary. *Id.* After he served his suspension, Mr. Rager did not have any disciplinary or performance issues for the nearly two months before he decided to resign. This is a far cry from the conduct described by the Seventh Circuit in *University of Chicago Hospital*. There, the court found the

"writing on the wall" when an employee had been warned of the employer's intention to terminate her, told her that a mistake on her part was the "last straw," and she arrived at work after vacation only to find her desk packed up, boxes piled up, and her office being used for storage. *Univ. of Chi. Hosps.*, 276 F.3d at 332.

Here, even construing all the evidence and reasonable inferences in Mr. Rager's favor, no reasonable employee standing in his shoes would believe that had he not resigned, he would have been immediately fired. Similar to *Chapin*, Mr. Rager may have had reason to believe termination was looming during the internal investigation, but Mr. Rager resigned "after the axe had been put away," months after his suspension. 621 F.3d at 679.[2] Nothing in the record suggests that Mr. Rager had a reason to believe that after his suspension concluded, he was going to face more discipline or immediate termination. Further, as indicated above, this form of constructive discharge does not eliminate the need for a plaintiff to show that his working conditions had become intolerable. *Univ. of Chi. Hosps.*, 276 F.3d at 332; *Cigan*, 388 F.3d at 333. As discussed below, Mr. Rager has not established that he suffered intolerable working conditions.

Second, Mr. Rager argues that he resigned because his 14-day unpaid suspension was unfair and he experienced "several petty denials of privileges," which convinced him he was not welcome at the Sheriff's Department and his job was "untenable." [DE 28 at 22]. Mr. Rager does not specify what these "petty denials" consist of, but the Court presumes they include not being allowed to attend the SWAT annual conference (pre-suspension) and being denied the opportunity to be a camp counselor (post-suspension). Mr. Rager testified that the entire SWAT

---

[2] This is not to say that the Court concludes a constructive discharge claim would have survived if Mr. Rager had resigned during the internal investigation.

team was going to a conference and he was told he could not attend. [DE 29-1 at 167].[3] Mr.
Rager also argues he was "demoted" within days of Sheriff Rager starting and that everyone but
him was invited to apply for whatever position they liked. Mr. Rager's own testimony
contradicts this argument. As discussed above, the transition from patrol to detective was not a
promotion and therefore, the transition back to patrol was not a demotion. Mr. Rager stated that
he "considered it [a] promotion," however, when asked if it was "technically [] a promotion or if
he "receive[d] an increase in pay," Mr. Rager answered no. *Id.* at 13–14. Chief Bucher also
testified that this position change was a lateral one. [DE 29-3 at 6].

    While Mr. Rager was the only drug task force detective to be moved to patrol at the start
of Sheriff Dukes' term, it was only because all the other drug task force detectives had since
retired. [DE 29-1 at 34]. Sheriff Dukes testified that had those detectives not retired, he would
have moved them back to the patrol assignment as well. [DE 29-2 at 18]. Mr. Rager was not the
only deputy whose job was changed when Sheriff Dukes started his term. Sheriff Dukes
announced 3-4 deputies would be back on patrol. In Mr. Rager's own words, at that first meeting
"it was explained that with the new administration coming in" positions were "opened up to
anybody, and everybody had an opportunity to put in for those positions." [DE 29-1 at 29].
Despite Mr. Rager arguing that Sheriff Dukes indicated everyone except for Mr. Rager could
apply for the drug task force, there is no record to support this assertion. Mr. Rager testified that
he chose not to apply for the position he previously held. *Id.* at 34. Mr. Rager also argues that
Sheriff Dukes launched the investigation into his performance just two months into his term, but
nothing in the facts support that. Chief Bucher testified that issues started compounding over the
course of a roughly four-month period which led to the formal internal investigation starting in

---

[3] During his testimony, he did not specify when this occurred but in the taped interview with Captain Marsh during
the investigation, he discussed the same occurrence, suggesting that it had already occurred. [DE 31].

May 2019. [DE 29-3 at 7–8]. The incident in February 2019, where Mr. Rager missed a shift, was the beginning of the work performance issues that the investigation covered. *Id.* Additionally, the only post-suspension "petty denial" that Mr. Rager can point to is the denial of being a camp counselor. [DE 29-1 at 166–67]. Nothing in these facts suggest that Mr. Rager's working conditions were intolerable. As discussed at length, the Court found that the evidence does not establish that Mr. Rager was retaliated based on his protected speech and therefore cannot be used to support a constructive discharge claim. Nor has Mr. Rager established that Sheriff Dukes displayed any harassing behavior sufficiently severe or pervasive to alter the conditions of his employment and that any abusive working environment became so intolerable that his resignation qualified as a fitting response. Rather, Sheriff Dukes appeared to enforce the Merit Board Rules and Mr. Rager struggled to adhere to them. A reasonable fact finder could not conclude that a reasonable person in Mr. Rager's shoes would find these conditions unbearable or intolerable and therefore, cannot rise to the high burden required to establish constructive discharge.

Lastly, Mr. Rager again cites to his son's affidavit in support of his constructive discharge claim. Even construing Stone's affidavit most favorably to Mr. Rager, the encounter between Sheriff Dukes and Stone cannot be the basis for Mr. Rager's constructive discharge claim. *See Chapin*, 621 F.3d at 679 ("One threat and raised voices would not rise to the level of a hostile work environment, and so it also cannot be the basis for [plaintiff's] constructive discharge claim."); *Tutman v. WBBM–TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000) ("A reasonable person would not have feared [the defendant] as a result of his single oblique threat, even construing all reasonable inferences in favor of [the plaintiff], such that he would feel forced to resign."). Even if Stone interpreted Sheriff Dukes' words to mean that he might

ban Stone from the Justice Building, which would make it impossible for him to work as a Deputy Coroner, it was not a threat of physical harm or an emotional harassment that is truly beyond the pale. Further, nothing in the record suggests that this interaction had anything to do with Mr. Rager or his working condition. This singular encounter between Sheriff Dukes and Mr. Rager's son does not rise to the level of egregiousness that would allow a reasonable jury to find that Mr. Rager's working conditions were intolerable.

Based on the undisputed material facts, a reasonable jury could not find that Mr. Rager's workplace conditions had become so intolerable or unbearable, either because Sheriff Dukes engaged in harassing behavior sufficiently severe or pervasive to alter the conditions of his employment or merely because a "prospect of discharge lurk[ed] in the background." Accordingly, Defendants' motion for summary judgment is granted as to Mr. Rager's constructive discharge claim.

### D.  Other Claims and Qualified Immunity

In his Amended Complaint, Mr. Rager alleges that Sheriff Dukes "negligently violated Ragers' [sic] rights under the Health Insurance Portability and Accountably Act." [DE 17 at 5]. In his response to motion for summary judgment, Mr. Rager withdrew his claim of negligence under Indiana law for the release of his medial information. [DE 28 at 11]. Therefore, the Court dismisses Mr. Rager's negligence claim. It appears Mr. Rager also withdrew his claim under HIPAA but to the extent he still intended to pursue his claim that Sheriff Duke violated HIPAA by releasing medical information, the claim is also dismissed because HIPAA does not furnish a private right of action. *Carpenter v. Phillips*, 419 Fed. App'x. 658, 659 (7th Cir. 2011); *see also Doe v. Bd. of Trs. of Univ. of Ill.*, 429 F.Supp.2d 930 (N.D. Ill. 2006) ("Every court to have

considered the issue . . . has concluded that HIPAA does not authorize a private right of action.").

Mr. Rager also alleged that the Sheriff's Department is liable under *respondeat superior* for the acts and omissions of Sheriff Dukes. [DE 17 at 5]. However, in his response, Mr. Rager does not address this claim or any of the Defendants' arguments in support of summary judgment on this claim. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597 (7th Cir. 2003) (holding that claims not addressed in a summary judgment opposition brief are deemed abandoned; *see, e.g.*, *Walsh v. Arrow Fin. Servs., LLC*, 2012 WL 255802, at *3 (N.D. Ill. Jan.27, 2012). ("[The plaintiff's] failure to reference, let alone defend, her first claim operates as an abandonment of that claim and a forfeiture of any argument opposing dismissal."). Therefore, the Court grants summary judgment in favor of the Defendants as to Mr. Rager's *respondeat superior* claim.

Lastly, the Defendants argue that, even if the Court finds that they violated Mr. Rager's constitutional rights, they are entitled to qualified immunity. The defense of qualified immunity, which protects government officials from liability for civil damages, requires a two-part inquiry: (1) whether the facts alleged by the plaintiff show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The steps can be assessed in either order. *Id.* at 236. Because Mr. Rager has failed to meet his burden on summary judgment by demonstrating that the Defendants' actions violated his constitutional rights, the Defendants are entitled to qualified immunity.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment as to Plaintiff's First Amendment retaliation claim, Fourteenth Amendment due

process claim, constructive discharge claim, and *respondeat superior* claim. [DE 26]. The Court DISMISSES Plaintiff's state-law negligence claim and HIPAA claim. The clerk is DIRECTED to enter judgment in favor of the Defendants.

SO ORDERED.

ENTERED: December 28, 2021

_____/s/ JON E. DEGUILIO_____
Chief Judge
United States District Court